BEVERLY GRANT AND THOMAS EDWARD GRANT, ET AL. [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Grant v. Commissioner
Docket Nos. 13765-89, 13766-89, 14882-89
United States Tax Court
T.C. Memo 1994-161; 1994 Tax Ct. Memo LEXIS 162; 67 T.C.M. (CCH) 2669; April 18, 1994, Filed *162 Decisions will be entered under Rule 155. Individual petitioner G was the beneficial owner of corporate petitioner T and managed T's restaurant. G deposited some of T's receipts into his personal bank accounts, and marked certain deposits that were made into T's corporate accounts as being loans from shareholder. The notices of deficiency were sent to petitioners more than 3 years after petitioners filed their Federal income tax returns for 1981, 1982, and 1983. 1. Held: The statute of limitations does not bar the assessment and collection of tax against G and T for 1981 and 1982, or against T for 1983; it does bar assessment and collection against G for 1983. Secs. 6501(c)(1) and 6501(e)(1), I.R.C. 1954. 2. Held, further, G and T are liable for 50-percent additions to tax for civil fraud for each of the open years. Secs. 6653(b) and 6653(b)(1), I.R.C. 1954. 3. Held, further, G (for 1982) and T (for fiscal 1982 and 1983) are liable for additional additions to tax based on the portions of the underpayments attributable to fraud; amounts determined. Sec. 6653(b)(2), I.R.C. 1954. 4. Held, further, Amounts of deficiencies determined. For petitioners: *163 John Kennedy Lynch. For respondent: Carol A. Szczepanik. CHABOT
CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual and corporate income tax and additions to tax under sections 6653(b)[2] (fraud) and 6661 (substantial understatement of income tax) against petitioners as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Petitioner
Year [1]
Deficiency
6653(b)
6653(b)(1)
6653(b)(2)
6661
Thomas Edward
1981
$ 11,534
$ 5,767
--
--
--
Grant
1982
71,574
--
$ 35,787
[2]
$ 17,894
13766-89
Beverly Grant
1983
15,233
--
7,617
[2]
3,808
and Thomas
Edward Grant
13765-89
Tavern of
1981
800
400
--
--
--
Chester, Inc.
1982
31,847
--
15,924
[2]
--
14882-89
1983
62,434
---
33,194
[3]
12,223
By answer to the petition of *164 Tavern of Chester, Inc. (docket No. 14882-89), respondent asserts an increased deficiency in the amount of $ 4,600, for a total deficiency for Tavern of Chester, Inc's fiscal 1982 in the amount of $ 36,447, as well as corresponding increases in the additions to tax under paragraphs (1) and (2) of section 6653(b). See sec. 6214(a). After concessions by both sides, [3] the issues for decision are as follows: (1) Whether the assessment and collection of deficiencies against petitioner Thomas Edward Grant (hereinafter sometimes referred to as Grant) for 1981, 1982, or 1983 are barred by the statute of limitations, sec. 6501(a), or are allowed (a) under the fraud exception, sec. 6501(c)(1) (as to 1981, 1982, and 1983), or (b) under the 25-percent-omission exception, sec. 6501(e)(1)(A) (as to 1982 and 1983), to the general period *165 of limitations. (2) Whether the assessment and collection of deficiencies against petitioner Tavern of Chester, Inc. (hereinafter sometimes referred to as Tavern), for fiscal 1981, 1982, or 1983 are barred by the statute of limitations, sec. 6501(a), or are allowed under the fraud exception, sec. 6501(c)(1), to the general period of limitations. (3) If assessment and collection are not barred against Grant or Tavern for 1981, 1982, or 1983, then for each year that is open -- (a) whether that petitioner is liable for civil fraud additions to tax under section 6653(b) (for 1981) and under sections 6653(b)(1) and 6653(b)(2) (for 1982 and 1983) and, as to section 6653(b)(2), in what amount; (b) what the amount is of Grant's and Tavern's unreported gross income; (c) whether Tavern's reported cost of goods sold should be decreased by $ 17,958 for its fiscal 1983; and (d) whether Tavern is entitled to deductions for travel and promotion expenses and for moving expenses in amounts greater than those allowed in the notice of deficiency.
*166 FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the respective petitions were filed in the instant consolidated cases, Beverly Grant, see supra note 3, resided in Chardon, Ohio, Grant resided in Mayfield Heights, Ohio, and Tavern had its principal place of business in Chesterland, Ohio. Grant was graduated from high school in 1967. His pre-Tavern experience in the food service industry includes the following: 4 years with Roy Rogers in Ohio; 2 years as an assistant manager for Minnie Pearl's in Tennessee; 3 years leasing and managing his own coffee shop and two subsidiaries in Ohio; and 4 years in management training at Church's Fried Chicken in Georgia. In 1980, he decided to open his own restaurant. Tavern was incorporated in 1980 in Ohio by Don P. Brown (hereinafter sometimes referred to as Brown), an attorney. Brown was Tavern's sole shareholder and president through at least 1982. However, as a practical matter, Brown was Tavern's lawyer and not its owner or decision maker. Brown responded to occasional requests for legal information from Tavern's accountant. Brown *167 did not play any role in Tavern's business operations or financial operations. Brown did not invest in Tavern. Brown's law firm prepared Tavern's minute books, but Brown was not involved in any of Tavern's other books and records. Brown signed Tavern's fiscal 1981 and 1982 Federal income tax returns. Grant was the sole beneficial shareholder and Brown was merely his nominee. At some point in 1983, Grant became Tavern's president and sole shareholder. On August 10, 1980, Tavern bought the Valley Villa Inn restaurant in Chesterland, Ohio, for $ 50,000. The purchase and sale agreement allocated $ 7,000 of that price to "licenses and permits". Grant's father provided the money for the purchase. The restaurant was in poor condition; Grant's father helped him pay for necessary repairs and improvements. Once the restaurant opened, Grant tended the restaurant's bar, cooked, cleaned, made repairs, and kept the records, often working 18-hour days. He lived in an apartment above the restaurant. Tavern operated the bar and restaurant during 1980 through 1983. Grant managed and operated Tavern from 1980 through 1983. Grant had personal bank accounts at Women's Federal, Cardinal Federal, *168 and Com-Bank/Pine Castle during 1981 through 1983. He made deposits into these accounts as shown in table 1. Table 1 Total
Total
Date
Bank
Amount
Fiscal
Calendar
7/13/81
Women's Federal 06-09720
$ 1,000.00
7/21/81
Women's Federal 06-09720
[1] 1,000.00
Total fiscal 1981 deposits
$ 2,000.00
8/24/81
Women's Federal #06-09720
[1] 2,000.00
8/31/81
Women's Federal #06-09720
[1] 2,000.00
9/08/81
Women's Federal #06-09720
[1] 2,000.00
9/12/81
Women's Federal #06-09720
[1] 2,000.00
9/13/81 [2]
Women's Federal #06-09720
[1] 1,000.00
10/05/81
Women's Federal #06-09720
[1] 1,000.00
Total calendar 1981 deposits
12,000.00
3/26/82
Women's Federal #06-09720
[1] 2,600.00
3/29/82
Women's Federal #06-09720
[1] 4,100.00
4/05/82
Women's Federal #06-09720
[1] 5,000.00
4/13/82
Com-Bank/Pine Castle
CD #A-0-1502
[3] 10,000.00
5/22/82
Women's Federal
#06-09720
[1] 2,250.00
6/12/82
Women's Federal #06-09720
[1] 4,000.00
6/14/82
Women's Federal #06-09720
[1] 4,000.00
6/21/82
Women's Federal #06-09720
[1] 5,325.00
6/22/82
Women's Federal #06-09720
[1] 2,425.00
7/06/82
Women's Federal #06-09720
6,000.00
7/17/82
Women's Federal #06-09720
4,500.00
7/19/82
Women's Federal #10-0607406
5,000.00
Total fiscal 1982 deposits
65,200.00
8/02/82
Cardinal Federal #15-008451
4,058.63
8/14/82
Women's Federal #06-09720
4,810.00
8/16/82
Women's Federal #10-0607454
[1] 3,600.00
8/16/82
Cardinal Federal #15-008451
3,200.00
8/21/82
Cardinal Federal #15-008451
4,400.00
9/08/82
Women's Federal #06-09720
3,172.00
9/10/82
Cardinal Federal #15-008451
2,300.00
9/11/82
Cardinal Federal #15-008451
4,950.00
9/13/82
Cardinal Federal #15-008451
5,779.00
9/16/82
Cardinal Federal #15-008451
985.00
9/17/82
Cardinal Federal #15-008451
1,542.67
9/18/82
Cardinal Federal #15-008451
2,940.00
10/15/82
Women's Federal #06-097201
15,000.00
11/12/82
Women's Federal #06-09720
531.00
Total calendar 1982 deposits
112,468.30
1/04/83
Women's Federal #03-0600523
15,000.00
4/04/83
Com-Bank/Pine Castle
#0381715569
1,000.00
4/18/83
Com-Bank/Pine Castle
#0381715569
700.00
Total fiscal 1983 deposits
73,968.30
Total calendar 1983 deposits
16,700.00
*169 In addition to the deposits listed above, Grant deposited a check in the amount of $ 12,141.37 into his personal account at Cardinal Federal #15-008451 in or after August 1982. Tavern had a corporate checking account at the Bank of Burton, which later became affiliated with Huntington Bank, during 1981 through 1983. Tavern operated an outdoor area under the name "Daffodil's, a Summer Place" during 1983. Tavern also had a bank account at Huntington Bank in the name of "Daffodil's, a Summer Place" during 1983. Grant was responsible for collecting daily receipts from Tavern and preparing the deposit documents for the corporate bank accounts during 1981 through 1983. Tavern's books included a "loan from shareholder" liability account. Grant gave to Tavern's accountants copies of deposit slips to Tavern's bank accounts. From time to time Grant indicated to Tavern's accountants that certain deposits to Tavern's bank accounts were loans from him to Tavern. He did this by highlighting items on bank statements and by making notations on bank deposit slips. At least one of these designated deposits, $ 3,000 deposited into Tavern's bank account on December 14, 1981, was a deposit of *170 Tavern's gross receipts. Tavern's accountants determined Tavern's taxable gross receipts by analyzing the deposits to its bank accounts. Tavern's accountants did not include the amounts identified as loans from Grant in Tavern's gross receipts subject to tax. Instead, these amounts were recorded as credit entries in the loan from shareholder account on Tavern's books. Tavern did not report any loans from Grant on the balance sheets on its fiscal 1981 and 1982 tax returns. On its fiscal 1983 tax return Tavern reported an opening balance of $ 21,246 and a closing balance of $ 35,055 for the loans from shareholder account, an increase of $ 13,809. Tavern's payments of Grant's personal expenses, and certain of its payments to Grant, were shown as debit entries in the loan from shareholder account on Tavern's books. These amounts paid to, or on behalf of, Grant were not reported as income on Grant's tax returns. Grant and Tavern employed several accountants during 1981 through 1983 to prepare Grant's and Tavern's tax returns. Harry Shapiro (hereinafter sometimes referred to as Shapiro) prepared Grant's 1981 tax return and Tavern's fiscal 1981 and 1982 tax returns. Stewart Weiskind *171 (hereinafter sometimes referred to as Weiskind) prepared Grant's 1982 tax return. Christopher Monty (hereinafter sometimes referred to as Monty) prepared Grant's and Beverly Grant's 1983 joint tax return and Tavern's fiscal 1983 tax return. Shapiro, Weiskind, and Monty are hereinafter sometimes referred to collectively as the accountants. The accountants used Forms W-2 and 1099 to prepare Grant's tax returns; they were not given copies of his personal bank statements. Weiskind became Grant's accountant after Weiskind and his father bought Shapiro's accounting practice. Weiskind prepared a fiscal 1983 tax return for Tavern. Grant took a physical inventory for Tavern as of July 31, 1983. Grant prepared an inventory list and gave the list to Weiskind, who used it to prepare Tavern's fiscal 1983 tax return, sometime before the end of January 1984. Based on this inventory list, Weiskind valued the inventory at $ 32,256.04 on the tax return. After Weiskind prepared Tavern's 1983 tax return, Grant told him that there was "no way the corporation owed that much money." The Tavern fiscal 1983 tax return that Weiskind prepared was not filed with respondent. Grant then fired Weiskind *172 and retained Monty as Tavern's accountant. During the summer of 1984, Monty prepared Tavern's fiscal 1983 tax return. Grant did not give Monty a copy of the written physical inventory list. Based on Grant's oral statements, records of Tavern's purchases, the fact that July 31, 1983, was a Sunday, the space available for holding inventory, and Monty's experience with other restaurants, Monty calculated Tavern's ending inventory value to be $ 14,298 on July 31, 1983. The Tavern fiscal 1983 tax return that was prepared by Monty was filed with respondent on September 10, 1984. Table 2 compares some of the information on the Tavern fiscal 1983 tax return prepared by Weiskind (not filed) with the one prepared by Monty (filed). Table 2 Item
Weiskind Monty Closing inventory
$ 32,256.04
$ 14,298
Cost of goods sold
532,045.76
550,013
Taxable income
105,660.38
49,024
Total tax
24,257.15
3,953
Tavern's correct July 31, 1983, closing inventory was $ 32,256.04. In preparing Tavern's tax returns, the accountants computed gross business receipts and business expenses solely by reference to the transactions in the business checking account at Huntington Bank, Tavern's *173 payroll summaries, and Tavern's journals. Grant initially provided cash register receipts to Shapiro, but stopped giving them to him sometime in 1981. None of the deposits to Grant's personal bank accounts were included in Tavern's reported gross income. The accountants were unaware of the receipts which were not deposited in Tavern's bank accounts. Grant knew that the accountants computed Tavern's gross receipts based solely on the deposits into Tavern's bank accounts. In August 1982, Tavern sold its liquor license to Michael's Foods, Inc., and received a check in the amount of $ 12,141.37 in payment for the liquor license. The check was deposited by Grant in his personal bank account at Cardinal Federal. This is the check referred to supra in the text immediately after table 1. Tavern's capital gain from the sale, $ 5,141.37, [4] was not reported on Tavern's fiscal 1983 tax return, and Grant did not report either the $ 5,141.37 gain or the $ 12,141.37 deposit on his 1982 tax return. *174 In 1981 Tavern paid $ 30,000 to Grant for management services, which Tavern deducted on its fiscal 1981 tax return and Grant reported on his 1981 tax return. This was shown on a Form 1099 from Tavern to Grant. In 1982 Tavern paid $ 8,000 to Grant as wages, etc., and $ 10,000 to Grant for management services. The wages amount was shown on a Form W-2 from Tavern to Grant, and the management services amount was shown on a Form 1099 from Tavern to Grant. Grant reported both of these amounts on his 1982 tax return. Tavern deducted both the $ 8,000 and the $ 10,000 on its fiscal 1982 tax return. In 1983 Tavern paid $ 35,500 to Grant as wages, etc., which was shown on a Form W-2 from Tavern to Grant and which Grant and Beverly Grant reported on their 1983 joint tax return. Tavern deducted $ 30,500 as compensation to Grant on its fiscal 1983 tax return. Tavern showed on its tax returns that it made distributions as follows: Fiscal 1981 -- $ 10 in cash, fiscal 1982 -- $ 10 in cash, and fiscal 1983 -- nothing. Grant did not report any dividend income on his 1981 and 1982 tax returns; he and Beverly Grant reported $ 200 of dividends on their 1983 joint tax return, but did not show *175 who was the payor. On his 1982 tax return Grant reported a total of $ 4,530 interest income, some from the bank accounts shown supra in table 1 and some from other accounts at the same banks. Grant did not report any interest income on his 1981 tax return or on his and Beverly Grant's 1983 joint tax return. On their 1983 joint tax return, Grant and Beverly Grant reported income in the amounts and from the sources indicated in table 3. Table 3 Source Amount Reported
Wages-Tavern of Chester
$ 35,500
Wages-Overall Paint, Inc.
(Beverly Grant)
14,648
Alimony received
2,200
Dividend
200
Trustee-Overall Paint, Inc.
15
Total gross income
52,563
On its tax returns Tavern reported amounts of receipts, cost of goods sold, deductions, taxable income, credits, and tax liability as shown in table 4. Table 4 [1]
Item 1981 1982 1983 Gross receipts
$ 329,871
$ 641,069
$ 1,146,905
Cost of good sold
206,288
468,349
550,013
Gross profit
123,583
172,720
596,892
Interest
-- -- 152
Gross rents
350
2,575
-- Amusement income
3,259
12,621
18,409
Total income
127,192
187,915
615,453
Total deductions
110,314
159,591
566,429
Taxable income
16,878
28,324
49,024
Credits
2,869
4,750
4,327
Tax liability after credits
-0-
-0-
3,953
*176 On May 17, 1988, Grant was indicted for violations of section 7201 (willful attempt to evade tax) with respect to his 1981 and 1982 tax returns, for a violation of section 7206(2) (willful aiding and assisting in the preparation of a false tax return) with respect to Tavern's fiscal 1982 tax return; and for a violation of section 7206(1) (willful subscribing of a false tax return) with respect to Tavern's fiscal 1983 tax return. Grant pled guilty to the charge under section 7206(2) relating to Tavern's fiscal 1982 tax return. [5] He was sentenced to 3 years' probation, ordered to pay a fine of $ 25,000, and ordered "to pay all taxes, interest, penalties and interest determined to be due to the Internal Revenue Service during the period of and as a condition of probation". Grant's tax returns were received by respondent on the following dates: The 1981 tax return (automatic extension) on June 9, 1982; the *177 1982 tax return by April 15, 1983; and the 1983 tax return (automatic extension) on July 30, 1984. Tavern's tax returns were received by respondent on the following dates: The fiscal 1981 tax return on October 16, 1981; the fiscal 1982 tax return on September 7, 1982; and the fiscal 1983 tax return on September 10, 1984. All the notices of deficiency in the instant cases are dated April 14, 1989, more than 3 years after petitioners filed their tax returns for all the years in issue. For each of the years 1981 and 1982, Grant had an underpayment of income taxes required to be shown on his tax return; some part of the underpayment for each year was due to Grant's fraud. For each of the years in issue, Tavern had an underpayment of income taxes required to be shown on its tax return; some part of the underpayment for each year was due to Tavern's fraud. OPINION I. Statute of Limitations
Petitioners have properly raised in their petitions the affirmative defense of the statute of limitations under section 6501(a). Rule 39.[6] In general, section 6501 [7] bars assessment of an income tax deficiency more than 3 years after the later of (1) the date the tax return was filed or *178 (2) the due date of the tax return. If the taxpayer proves that the notice of deficiency was mailed more than 3 years after the later of the filing or the due date, then respondent has the burden of pleading and proving the existence of an exception to the general period of limitations. Stratton v. Commissioner, 54 T.C. 255, 289 (1970); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069 (1928); see Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); see also Minahan v. Commissioner, 88 T.C. 492, 506 (1987). *179 In the instant cases, we have found that all petitioners' tax returns were filed more than 3 years before the respective notices of deficiency were issued. Petitioners contend that respondent failed to carry her burden of proof by (1) failing to prove any underpayments of tax and (2) failing to prove that Grant or Tavern intended to evade any tax liabilities. Petitioners contend that, if Grant diverted any of Tavern's receipts, then Tavern would be entitled to offsetting deductions. Also, petitioners contend, Tavern did not have enough earnings and profits to pay dividends. Respondent contends that the instant cases fall within the exceptions to the general period of limitations on account of fraud (sec. 6501(c)(1) [8] -- Grant and Tavern, all years) and 25-percent omissions (sec. 6501(e)(1)(A) -- Grant, 1982 and 1983). Respondent also maintains that (1) the diverted amounts are not deductible by Tavern because the amounts are dividends and (2) Tavern had sufficient earnings and profits for each of the years to support dividend treatment. *180 We agree with respondent that (1) Tavern is not entitled to deduct the diverted amounts, (2) Tavern had sufficient earnings and profits to support dividend treatment, (3) for each of the years in issue, Tavern had an underpayment of tax some part of which was due to fraud, and (4) for each of the years 1981 and 1982, Grant had an underpayment of tax some part of which was due to fraud. We agree with petitioners that respondent failed to carry her burden as to Grant for 1983, under both the fraud exception and the 25-percent-omission exception. As a result, 1983 is closed for Grant; all the other years are open, as to both Grant and Tavern. Respondent has the burden of proving the applicability of the fraud exception to the general period of limitations. Farmers Feed Co. v. Commissioner, supra. This burden is the same as that which respondent bears under section 6653(b). Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 232 (3d Cir. 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Brothers of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). *181 To carry this burden for a year as to a petitioner, respondent must prove two elements: (1) That that petitioner has an underpayment of tax for that year, and (2) that some part of that underpayment is due to fraud. Sec. 7454(a); [9] Rule 142(b); e.g., Carter v. Campbell, 264 F.2d 930, 936 (5th Cir. 1959); Stone v. Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105, 114 (1969). Each of these elements must be proven by clear and convincing evidence. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 663-664 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). *182 For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud (compare infra, part II.B, discussion of the addition to tax under section 6653(b)(2) for 1982 and 1983), but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. In carrying her burden, respondent may not rely on petitioners' failure to meet their burden of proving error in respondent's determinations as to the deficiencies. E.g., Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982), and cases there cited. Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Drieborg v. Commissioner, 225 F.2d 216, 219-220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated *183 Feb. 24, 1954; Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). A mere understatement of income does not establish fraud. However a pattern of consistent underreporting of income for a number of years is strong evidence of fraud. Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37 and 1970-144; Otsuki v. Commissioner, 53 T.C. at 108. The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d at 303; Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224. In order to establish fraud as to a petitioner, respondent must show that that petitioner intended to evade taxes, which he or it knew or believed was owed, by conduct intended *184 to conceal, mislead, or otherwise prevent the collection of taxes. E.g., Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Danenberg v. Commissioner, 73 T.C. 370, 393 (1979); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). This intent may be inferred from circumstantial evidence, Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), including the implausibility of petitioner's explanations. Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated March 14, 1951. A. Tavern -- Fraud
(1) Underpayments of Tax
Respondent used the specific adjustments method to determine Tavern's income for the years in issue. *185 More than three-fourths of the adjustment increases fall into one of two categories: (1) Amounts determined to be Tavern's receipts that were deposited into Grant's bank accounts, see supra table 1, and (2) amounts determined to be Tavern's receipts that were deposited into Tavern's bank accounts but recorded in Tavern's books as loans from Grant. These two categories of respondent's determinations in the notice of deficiency are summarized in table 5. Table 5 Fiscal
Deposits Into
Designated As
Year
Grant's Accounts
Loans From Grant
Totals
1981
$ 2,000.00
-0-   $ 2,000.00
1982 [1]
55,200.00
$ 29,155.87
84,355.87
1983 [1]
83,968.30
20,578.69
104,546.99
In this portion of the opinion we also will consider the fiscal 1983 *186 adjustments on account of Tavern's closing inventory and Tavern's sale of its liquor license. Grant took some of Tavern's gross receipts and deposited them into his personal bank accounts. These deposits bypassed Tavern's record-keeping system, on which the accountants depended for determining Tavern's receipts. As a result, these amounts were not reported on Tavern's tax returns even though these amounts were income taxable to Tavern. From time to time Grant indicated to the accountants that certain deposits into Tavern's bank accounts were loans by him to Tavern. The accountants excluded from Tavern's gross receipts the amounts so indicated, and instead, credited Tavern's loan from shareholder liability account. Some of these deposits were Tavern's assets to begin with; they should have been included in Tavern's gross receipts. As a result, the amounts of the misdescribed deposits were not reported on Tavern's tax returns even though these amounts were income taxable to Tavern. We consider first the deposits into Grant's personal bank accounts. As table 1, note 2, shows, Grant acknowledged to Judy Pekarik (hereinafter sometimes referred to as Pekarik), an internal revenue *187 agent, that he deposited $ 1,000 of Tavern's gross receipts into his personal bank accounts in Tavern's fiscal 1981, $ 39,700 in Tavern's fiscal 1982, and $ 3,600 in Tavern's fiscal 1983. Grant testified that he did not remember where the 1981 deposits came from and did not even remember that he had made deposits in 1981, but that if he made the deposits, then "they were basically made to repay me money that my father lent me to start the business up with." He then testified as follows: A [Grant] Basically, that money came from the Tavern of Chester. I received the money, and I was going to -- and I repaid it back to my loan account to pick up the money that we lent the company to repay it back. If there was any money -- you know -- either we did it that way, or we did it with the belief that -- see -- you know -- back in those years, they weren't allowed to have money market accounts. Yes, you were allowed to have a savings account, but the corporation did not.
Grant then proceeded to suggest that, of the listed 1982 deposits, a $ 10,000 deposit (see table 1, note 3) probably was a transfer from another account, a $ 15,000 deposit (Tavern's fiscal 1983) probably came from *188 a loan from one Wayne Mack, a $ 531 deposit (Tavern's fiscal 1983) was "probably interest that I received on that account", a $ 5,000 deposit probably was a birthday gift from his father, a $ 5,779 deposit (Tavern's fiscal 1983) probably was from the sale of his 1981 Toronado, a $ 3,600 deposit (Tavern's fiscal 1983) was into an account that he did not think was his account (the parties stipulated that this was deposited into one of Grant's personal bank accounts), a $ 5,325 deposit was a loan from his mother, and a $ 4,000 deposit "came from" his mother's account. Grant then testified that the 1983 $ 15,000 deposit probably was a transfer of the $ 15,000 that had been lent to him by Wayne Mack and deposited initially into a different account. Grant then testified as follows regarding transfers between his bank accounts: Q [Szczepanik] Okay. Mr. Grant, you didn't open the Cardinal Federal bank account until sometime late in 1982, did you? A [Grant] I can't honestly answer that. I don't recall the dates. I opened accounts every week. The money was coming in. I put money in different accounts. I rolled them over. I -- whoever offered the best return on the investment, that's *189 where I took it. I shopped it out. Every Tuesday morning I shopped it out to see which paid the best interest.
Grant then testified that he had received a check for more than $ 15,000 from Wayne Mack in June 1982, that he cashed the check, and that he deposited the proceeds of that check on June 12 ($ 4,000), June 14 ($ 4,000), June 21 ($ 5,325), and June 22 ($ 2,425). He testified that the October 15, 1982, $ 15,000 deposit (which was made into the same account that the four June deposits were made into) might have been made "to get a better interest on it." An hour earlier, Grant had testified that the June 14 ($ 4,000) and June 21 ($ 5,325) deposits probably came from his mother. Neither side saw fit to bring in (or explain the whereabouts of) Wayne Mack, who might have been able to provide us with information about the amounts and times of any loans from him to Grant, as well as of repayments of those loans. The evidence is clear that the accountants did not know anything about Grant's personal bank accounts, except as to the 1982 Forms 1099 for his interest income. From the accountants' testimony, we conclude that they did keep track of Tavern's loan from shareholder *190 liability account and would have reduced the balance of that account if the asserted Tavern repayments of those loans had been made by checks drawn on Tavern's accounts, but would not have done so if those repayment were by Grant's interceptions of Tavern's receipts. Neither side saw fit to provide us with Tavern's bank account records or Tavern's loan from shareholder liability account records. As to the deposits into Grant's personal bank accounts, we conclude that respondent has shown by clear and convincing evidence that, in accordance with Grant's acknowledgments to Pekarik, Tavern omitted $ 1,000 gross receipts for its fiscal 1981, $ 39,700 for its fiscal 1982, and $ 3,600 for its fiscal 1983. We next consider the deposits into Tavern's bank accounts that Grant designated as shareholder loans. The parties have seen fit to provide us with very little evidence on that subject. We have respondent's determinations in the notice of deficiency as to six deposits in Tavern's fiscal 1982, and two deposits in its fiscal 1983, but those determinations are not evidence. We have evidence that Tavern maintained a loan from shareholder liability account, but no evidence as to either *191 the times or amounts of the changes in the balance of the account. We have in evidence three of Tavern's fiscal 1982 deposit slips and one of Tavern's fiscal 1983 deposit slips that contain notations that the amounts came from Grant. We have conflicting testimony from Grant's mother and from an internal revenue special agent as to whether Grant's mother had told the agent that Grant's father had lent money to Grant after the end of 1980. The only clear and convincing evidence is that one of the exhibits, for a deposit credited on December 14, 1981, includes copies of checks that are Tavern's gross receipts. This shows that, on at least one occasion, Grant designated Tavern's gross receipts as loans from him to Tavern. Thus, Grant bypassed the accountants' record-keeping scheme and enabled himself to take money from Tavern, on the books, without that money being charged as income to Tavern. The total deposit on that occasion was $ 3,000. As to the deposits into Tavern's bank accounts that Grant designated as shareholder loans, we conclude that respondent has shown by clear and convincing evidence that Tavern omitted $ 3,000 gross receipts for its fiscal 1982. In addition, petitioners *192 concede, supra note 3, that Tavern did not report its $ 5,141.37 gain on the sale of its liquor license for Tavern's fiscal 1983. The parties have stipulated that Grant deposited the entire $ 12,141.37 proceeds of the liquor license sale into one of his personal bank accounts. Grant took a physical inventory for Tavern as of July 31, 1983. He prepared an inventory list and gave it to Weiskind, who used it to prepare Tavern's fiscal 1983 tax return. Weiskind concluded, based on Grant's inventory report, that Tavern's fiscal 1983 closing inventory was $ 32,256.04. Grant rejected the Tavern tax return that Weiskind prepared, hired Monty to prepare Tavern's fiscal 1983 tax return, and did not give to Monty the inventory list that he had given to Weiskind. Monty estimated a closing inventory of only $ 14,298. We conclude, and we have found, that Weiskind's conclusion was the correct one. In determining a business' income, cost of goods sold is subtracted from gross sales. See sec. 1.61-3(a), Income Tax Regs. In determining a business' cost of goods sold, closing inventory is subtracted from the sum of opening inventory and cost of goods purchased. A reduced closing inventory *193 results in an increased cost of goods sold, which thereby results in a reduced gross income. Thomas v. Commissioner, 92 T.C. 206, 217 (1989). Thus, Grant's failure to give to Monty the physical inventory sheet that Grant had given to Weiskind resulted in Tavern's cost of goods sold being shown on its fiscal 1983 tax return as $ 17,958.04 ($ 32,256.04 minus $ 14,298) more than it should have been. This resulted in Tavern's gross income (and hence, its taxable income) being understated by $ 17,958.04. [10]
Petitioners contend that, if Grant diverted any of Tavern's receipts, then Tavern would be entitled to *194 offsetting deductions. Petitioners do not specify the statutory basis for their contention, but we gather it is as compensation under section 162(a)(1). [11]
For an amount to be deductible under section 162(a)(1) the amount must not only must be reasonable, but also it must be paid or incurred with the intent to compensate for personal services. Whitcomb v. Commissioner, 733 F.2d 191, 193-194 (1st Cir. 1984), affg. 81 T.C. 505, 513-515 (1983); Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo. 1971-200; *195 Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). Whether this intent has been proven is a factual question to be determined on the basis of the particular facts and circumstances of the case. Whitcomb v. Commissioner, 733 F.2d at 194; Nor-Cal Adjusters v. Commissioner, 503 F.2d at 362; Paula Construction Co. v. Commissioner, 58 T.C. at 1059. Grant received $ 30,000 from Tavern in Tavern's fiscal 1981 and $ 10,000 in Tavern's fiscal 1982, which were reported as compensation for "management services". He received $ 8,000 in Tavern's fiscal 1982, which was reported as wages, and $ 30,500 in Tavern's fiscal 1983, which was reported as compensation of officer. None of the accountants testified that the amounts that Grant diverted from Tavern were ever intended to be additional compensation for Grant's services to Tavern. Indeed, the accountants testified that they were unaware of any of these diversions. Brown testified that he was unaware of most *196 of what went on and that he merely did some legal work and responded to questions. Grant was Tavern's owner (or beneficial owner) throughout the period before us; he testified; he gave no indication that the amounts he diverted from Tavern were intended in whole or in part to be compensation to him. In fact, all the testimony he gave that bore upon the matter tended to deny that he received compensation in addition to what he and Tavern reported on their tax returns. We conclude that none of the diverted amounts were paid by Tavern to Grant as compensation for the personal services that Grant performed for Tavern. Under these circumstances, it is not necessary for us to determine what amounts would have been reasonable compensation for Grant for the years in issue. We conclude that Tavern is not entitled to offsetting compensation deductions for the amounts diverted by Grant. For its fiscal 1981, Tavern calculated that its investment credit otherwise allowable exceeded its tax lability by $ 194.19. Tavern carried this excess over to its fiscal 1982 tax return, where the carryover helped produce an excess investment credit of $ 51.96. Tavern carried a $ 52 excess over to its *197 fiscal 1983 tax return, where all of its claimed investment credit was used up against its reported tax liability. In the notice of deficiency, respondent allowed all of Tavern's claimed investment credits. We conclude that the claimed investment credits would not eliminate Tavern's underpayment of tax for any of the years in issue. Petitioners do not allege that there are any other credits, exclusions, or deductions in addition to those claimed on Tavern's tax returns which would eliminate Tavern's underpayment of tax for any of the years in issue. In summary, we conclude that respondent has proven by clear and convincing evidence that Tavern's taxable income was understated by the amounts set forth in table 6. Table 6 Category of
Fiscal Year
Adjustment 1981 1982
1983
Deposits into Grant's
$ 1,000
$ 39,700
$ 3,600.00
accounts
Designated as loans
--
3,000
--
from Grant
Sale of liquor
--
--
5,141.37
license
Closing inventory
--
--
17,958.04
Totals
1,000
42,700
26,699.41
We conclude that respondent has proven by clear and convincing evidence that Tavern has an underpayment of tax for each of the years in issue. We hold for respondent on *198 this issue. (2) Fraudulent Intent
A corporation is a separate entity, created by statute, which acts through its officers, employees, and agents. Benes v. Commissioner, 42 T.C. 358, 382-383 (1964), affd. 355 F.2d 929 (6th Cir. 1966); Ace Tool & Eng., Inc. v. Commissioner, 22 T.C. 833, 843 (1954). Although Grant was neither a shareholder nor a director before 1983, Tavern's stock was held on his behalf. Brown, while nominally both shareholder and president, neither invested in the company nor kept its records. Where there are a number of shareholders, all of whom are parties to the fraud, their fraudulent intent is attributed to the corporation. Ace Tool & Eng. Inc. v. Commissioner, supra.Similarly, the fraud of a sole or dominant shareholder can be attributed to the corporation. Benes v. Commissioner, supra; Auerbach Shoe Co. v. Commissioner, 21 T.C. 191, 194 (1953), affd. 216 F.2d 693, 697-698 (1st Cir. 1954). Corporate fraud exists if an agent commits *199 fraud and the corporation is the agent's alter ego, or the agent is acting on behalf of the corporation such that the corporation actually benefits from the fraudulent acts. Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 506 (10th Cir. 1973), affg. on this issue T.C. Memo. 1971-194; see Federbush v. Commissioner, 34 T.C. 740, 749-751 (1960), affd. 325 F.2d 1 (2d Cir. 1963). We examine the actions of Grant, as Tavern's agent and sole beneficial shareholder, and later as its officer and sole shareholder. Grant maintained personal bank accounts into which he deposited some of Tavern's receipts in each of the years in issue. These receipts completely bypassed the systems that the accountants established for determining the amount of Tavern's gross receipts. Grant knew that the accountants were determining the amounts of Tavern's gross receipts on the basis of the deposits into Tavern's bank accounts. Thus, Grant knew that his diversions of Tavern's receipts would cause Tavern's gross receipts to be underreported on its tax returns. Grant stopped giving *200 cash register tapes to Shapiro, and did not give them at all to Weiskind and Monty. As a result, the accountants did not have any information they could use to check the completeness of Tavern's bank deposit records. Grant knew that, when he told the accountants that certain of the Tavern deposits were loans from him to Tavern, the accountants would then reduce Tavern's reported gross receipts. Grant knew that he was supposed to see to it that Tavern's money was deposited in Tavern's bank accounts. Yet, when Tavern received a check for the proceeds from its sale of its liquor license, Grant diverted the check to one of his own bank accounts. As a result, the accountants did not know that Tavern sold the liquor license, did not know that Tavern realized a gain, and so did not report the gain on Tavern's fiscal 1983 tax return. When Grant's cooperation with Weiskind as to Tavern's fiscal 1983 closing inventory helped to produce a Tavern fiscal 1983 tax liability not to Grant's liking, Grant not only fired Weiskind and hired a new accountant, Monty; he also did not give to Monty the physical inventory information he had given to Weiskind. Grant pled guilty to assisting in the *201 preparation of a false tax return, with respect to Tavern's fiscal 1982 tax return. Grant's explanations at trial in the instant case were contradictory and unbelievable. We conclude from the foregoing, and we have so found, that respondent has shown by clear and convincing evidence that some part of Tavern's underpayment of tax for each of the years in issue was due to Tavern's fraud. As a result, the statute of limitations is not a bar to respondent's assessment and collection of Tavern's income tax for any of the years in issue. We hold for respondent on this issue. B. Grant -- Fraud
(1) Underpayments of Tax
Respondent used the specific adjustments method to determine Grant's income for the years in issue. All adjustment increases fall into one of two categories: (1) Amounts determined to be Tavern's receipts that were deposited into Grant's bank accounts, see supra table 1 and sentence immediately after that table, and (2) amounts determined to be Tavern's receipts that were deposited into Tavern's bank accounts but recorded in Tavern's books as loans from Grant. Respondent's determinations are summarized in table 6. Table 6 Deposits Into
Designated As
Year
Grant's Accounts
Loans From Grant
Totals
1981
$ 12,000.00
$ 11,500.00
$ 23,500.00
1982
124,609.67
23,581.83
148,191.50
1983
16,700.00
20,921.73
37,621.73
*202 As we explained in analyzing Tavern's underpayments of tax, supra A.(1), we are persuaded that respondent has proven by clear and convincing evidence that the deposits identified at note 2 on table 1 were income to Grant. These deposits total $ 11,000 for 1981 and $ 33,300 for 1982. These deposits bypassed Tavern's record-keeping system, the amounts thereof did not show up on Tavern's books as payments to Grant or on his behalf, and so these amounts were not included in the Forms W-2 and 1099 that Tavern prepared for Grant and that Grant provided to the accountants. As a result, these amounts were not reported on Grant's tax returns even though these amounts were income taxable to Grant. As we explained in analyzing Tavern's underpayments of tax, we are persuaded that respondent has proven by clear and convincing evidence that the December 14, 1981, $ 3,000 deposit to Tavern's bank account, which Grant identified as a loan from himself to Tavern, was really part of Tavern's gross receipts. As a result of Grant's identification, the amount of this deposit was credited to Tavern's loan from shareholder liability account. When Tavern paid amounts for Grant's benefit, these *203 payments were debited to Tavern's loan from shareholder liability accounts, and were not included in the Forms W-2 and 1099 that Tavern prepared for Grant and that Grant provided to the accountants. The $ 3,000 deposit, or the payments by Tavern on Grant's behalf, [12] was income taxable to Grant but was not reported on Grant's tax returns. *204 As we explained in analyzing Tavern's underpayments of tax, we are persuaded by clear and convincing evidence that the $ 12,141.37 liquor license sale proceeds check, which the parties stipulated Grant deposited into his personal account, was income to Grant. This item bypassed the record-keeping system the accountants established for Tavern, so escaped the accountants' notice, so was not noted on Forms W-2 or 1099 that Tavern prepared for Grant, and so was not included in income on Grant's tax return. However, all of the foregoing items of income were for 1981 or 1982. Although it may be that Grant continued to divert Tavern's receipts in 1983, the evidence that he continued to do so after 1982 is not clear and convincing. Similarly, although Grant continued to identify some of Tavern's 1983 bank deposits as loans from himself, the evidence is not clear and convincing that any of the 1983 deposits were deposits of Tavern's gross receipts. Also, the liquor license sale proceeds diversion occurred in 1982. The testimony of respondent's agents, as to the conclusions they reached after examining evidence that is not before us, is not clear and convincing evidence of fraud. C.B.C. Super Markets, Inc. v. Commissioner54 T.C. 882, 896-897 (1970). *205 Thus, we conclude that respondent has failed to prove by clear and convincing evidence that Grant had an underpayment of tax for 1983. Petitioners contend that Grant was not a shareholder of Tavern in 1981 and 1982, so any diversions of Tavern's receipts could not be dividends to Grant. We disagree. Brown, Tavern's incorporator and sole shareholder during those years, was merely Grant's nominee. Grant was the sole beneficial shareholder of Tavern from the start of Tavern's existence. The mere formal listing of Brown as shareholder does not suffice to insulate Grant from either the benefits or burdens of the status of being Tavern's sole shareholder. See, e.g., Richardson v. Shaw, 209 U.S. 365 (1908). Petitioners contend that Tavern did not have enough earnings and profits, so that any amounts that Grant diverted from Tavern would be returns of capital and not taxable as dividends to Grant. The tax treatment of a corporate distribution to a shareholder is provided for in section 301, [13] *206 which directs the reader to the definition of "dividend" in section 316, [14] which in turn depends on the meaning of "earnings and profits". The Internal Revenue Code does not specifically define the phrase "earnings and profits". The term, as a tax concept, does not correspond exactly to either taxable income or corporate tax accounting concepts. Commissioner v. Wheeler, 324 U.S. 542, 546 (1945). *207 A corporation's earnings and profits are generally calculated by making certain adjustments to the corporation's reported taxable income. See pars. (a) and (b) of sec. 1.312-6, Income Tax Regs.; see also sec. 312. Tavern reported positive taxable income for each of its fiscal years in issue, see supra table 4. For our purposes, it is sufficient to add to Tavern's reported taxable income the gross receipts which respondent clearly and convincingly proves were not included in Tavern's taxable income, see DiLeo v. Commissioner, 96 T.C. at 888-889, and, if appropriate, [15] to subtract the resulting tax deficiency and appropriate additions to tax. See Hagaman v. Commissioner, 958 F.2d 684, 691-694 (6th Cir. 1992), affg. in part and remanding in part T.C. Memo. 1987-549; DiLeo v. Commissioner, 96 T.C. at 889; cases collected at 10 Mertens, Law of Federal Income Taxation, secs. 38C.38-38C.40, at 60-65 (1991 rev.) *208 We conclude that, taking into account the omissions from Tavern's income that respondent has proven by clear and convincing evidence, and the adjustments that follow as consequences, respondent has proven by clear and convincing evidence that Grant's diversions from Tavern are taxable to Grant as dividends and are not merely returns of capital. We hold, for respondent, that respondent has proven by clearing and convincing evidence that Grant had underpayments of tax for 1981 and 1982. We hold, for petitioners, that respondent has failed to prove by clear and convincing evidence that Grant had an underpayment of tax for 1983. (2) Fraudulent Intent
Grant maintained personal bank accounts into which he deposited Tavern's receipts in 1981 and 1982. Also, on at least one occasion in 1981 he identified a Tavern deposit of Tavern's gross receipts as being a loan from him. The diverted corporate receipts were not reported to the accountants and were not reported on his and Tavern's income tax returns. The accountants prepared Tavern's tax returns on the basis of deposits to Tavern's corporate bank accounts. The improperly designated shareholder loan also was not reported on his *209 and Tavern's tax returns. The accountants prepared his individual tax returns on the basis of his Forms W-2 and 1099. By failing to provide any information about his personal bank accounts, Grant concealed from the accountants the corporate funds which he deposited into his personal bank accounts. Grant's failure to report this income to the accountants who prepared his tax returns is evidence of his intent to file false and fraudulent tax returns. See Farber v. Commissioner, 43 T.C. 407, 420 (1965). In addition, Grant failed to retain Tavern's cash register tapes, and stopped giving them to Shapiro sometime during 1981. Without these tapes the accountants could not discover that a portion of Tavern's income was being taken by Grant. An intentional failure to keep adequate records and provide them to the tax return preparer is an indication of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1568-1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63. Grant testified that he did not understand the nature of a corporation and he often treated Tavern as a sole proprietorship. When a claim of ignorance *210 or honest mistake is made, this Court must consider the taxpayer's intelligence, education, and tax expertise in making its determination. Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986); Iley v. Commissioner, 19 T.C. 631, 635 (1952). Grant built Tavern's business from scratch after having had a variety of experiences in the food service industry. He was told by the accountants that their work on Tavern's income taxes would be based on Tavern's bank records. Grant's tax returns were prepared solely on the basis of the materials he furnished to the accountants. In the vernacular, it does not take a rocket scientist to realize that when Grant diverted Tavern's gross receipts and deposited them into his personal bank accounts, and did not inform the accountants, then the diverted amount would escape taxation to Tavern and escape taxation to him. As the quoted extract from Grant's testimony, supra part I.A.(1), shows, at trial Grant tried to convince us that the deposits of Tavern's receipts into his personal bank accounts were merely a sophisticated effort to conform to asserted differences between what corporations *211 could do and what individuals could do, in the context of interest-bearing bank accounts. Yet, at the same time he proposes to convince us that he did not understand the difference between his corporation and himself. We already have noted the conflicting explanations he gave at trial, with regard to the sources of the deposits into his personal bank accounts. Lack of schooling does not automatically require a finding that Grant could not have filed fraudulent tax returns. Webb v. Commissioner, 394 F.2d at 379-380, and cases there cited. We are satisfied that Grant's intelligence, education, and tax expertise were such that he knew what he was doing with regard to his income taxes. We conclude that respondent has proven that all of the underpayment attributable to the items that we held that Grant omitted from his income, supra part I.B.(1), are due to fraud. As a result, the statute of limitations does not bar assessment and collection as to 1981 and 1982. We hold for respondent as to 1981 and 1982 on this issue. C. Grant -- 25-Percent Omission
Because we have not found any fraudulent underpayment by Grant for 1983, respondent cannot *212 rely for that year on the exception set forth in section 6501(c)(1) to the general period of limitations in section 6501(a). In the answer, respondent asserts in the alternative that she is entitled to the 6-year period provided for in section 6501(e)(1)(A) [16] for Grant as to 1983. The generally applicable 3-year period is extended to 6 years when there has been an omission from gross income of "an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return." Sec. 6501(e)(1)(A). *213 The burden is on respondent to establish by a preponderance of the evidence that the 6-year statute applies. Stratton v. Commissioner, 54 T.C. at 289; Philipp Bros. Chemicals, Inc. (Md.) v. Commissioner, 52 T.C. 240, 254-255 (1969), affd. 435 F.2d 53 (2d Cir. 1970); Williamson v. Commissioner, 27 T.C. 647, 659, 662-663 (1957); see Colestock v. Commissioner, 102 T.C.    ,    ,     (1994) (slip op. at 6, 17); Burbage v. Commissioner, 82 T.C. 546, 553 (1984), affd. 774 F.2d 644 (4th Cir. 1985). The 6-year statute of limitations applies to both spouses on a joint tax return where respondent proves that an omitted amount was "properly includable" in the aggregate gross income of the joint taxpayers and exceeds 25 percent of the gross income reported, regardless of which spouse earned or received the omitted income. Benjamin v. Commissioner, 66 T.C. 1084, 1100-1101 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). The gross income stated in *214 Grant's and Beverly Grant's 1983 tax return is $ 52,363; 25 percent of this amount is $ 13,090.75. Respondent contends that for 1983 Grant omitted income diverted from Tavern totaling $ 16,700 and income from deposits to Tavern's account marked as shareholder loans totaling $ 20,921.73. Petitioners contend that respondent has failed to carry her burden of proving that the 6-year period under section 6501(e)(1) applies. We agree with petitioners that respondent has failed to carry her burden of proof on this issue. Respondent has not provided us with any documents to support her contention that the three stipulated deposits to Grant's individual bank accounts in 1983, supra table 1, included Tavern's diverted receipts. The only evidence on this point other than the stipulated deposits is the testimony of John J. Stickney (hereinafter sometimes referred to as Stickney), an internal revenue special agent. Stickney testified as follows: Q [Szczepanik] Thank you. Did your investigation show that Mr. Grant stopped taking corporate gross receipts at some point in time? A [Stickney] Yes. It showed that Mr. Grant stopped taking the receipts in approximately the first four months *215 of 1983. Q Did you ask Mr. Grant why he stopped taking receipts at that time? A Yes, I did. Q And what was his response? A Mr. Grant's response was, by then, he had gotten everything he wanted, and that included, according to Mr. Grant, a house that he purchased in Florida for cash -- worth $ 52,000 that he obtained without any financing, two Corvettes, some furniture, and the increased monies in this bank account.
However, neither Stickney's testimony nor other evidence in the record backs up Stickney's conclusion as to Grant's activities in 1983. Stickney's interpretation is not an effective substitute for evidence bearing on this point. Also, at another point, Stickney testified that Grant's admissions to him as to the cash deposits into Grant's personal bank accounts related only to 1981 and 1982. The totality of this evidence fails to persuade us that any of the 1983 deposits into Grant's personal bank accounts were diversions of Tavern's receipts. The only document respondent introduced to support her allegation that Grant marked Tavern's income as a shareholder loan in 1983 is a deposit slip dated May 19, 1983, to one of Tavern's bank accounts. The deposit slip *216 appears to record the deposit of four checks totaling $ 14,652.73 and marked "Loan from T. Grant". However, this deposit slip is dated a few weeks after the period that Stickney suggested marked the end of Grant's diverting receipts from Tavern. The five other 1983 shareholder loan deposits determined in the notice of deficiency are determined to have been made months later. Nothing on the May 19, 1983, deposit slip -- and no other evidence in the record -- persuades us that that shareholder loan deposit, or any other 1983 shareholder loan deposit, was a deposit of Tavern's receipts and not a true loan from Grant. Thus, respondent has failed to persuade us by a preponderance of the evidence that Grant and Beverly Grant omitted more than $ 13,090.75 gross income from their 1983 tax return. It follows that the statute of limitations bars assessment and collection of deficiencies in income tax and additions to tax against Grant for 1983. We hold for petitioners on this issue. II. Fraud Additions to Tax
A. Fifty-Percent Additions
In order to impose the 50-percent fraud addition to tax for 1981 (section 6653(b)) [17] or for any of the later years before us (sec. 6653(b)(1)) *217 on Grant or Tavern, respondent must prove, by clear and convincing evidence, that petitioner has an underpayment of tax for that year, and that some part of that underpayment is due to fraud. Our conclusion as to the statute of limitations issue results in our concluding that respondent has carried her burden of proof as to the 50-percent addition to tax for each of the years that is not barred by the statute of limitations. *218 We hold for respondent on this issue. B. Additional Amount for-Portion Attributable to Fraud
The additional amount added to the tax under section 6653(b)(2) (equal to 50 percent of the interest payable under section 6601) applies only to the portion of the underpayment which is attributable to fraud. In the notices of deficiency respondent determined that this additional amount applies to the entire deficiencies for Grant for 1982 and Tavern for fiscal 1982 and 1983. (Respondent also made this determination as to Grant, for 1983, but we have held, part I.B. and C., that that year is closed by the statute of limitations.) Respondent has the burden of proving what portion of the deficiency is attributable to fraud. Sec. 7454(a); Rule 142(b). [18]
*219 (1) Tavern
In part I.A. of this opinion, we considered the parties' disputes as to the amounts of Tavern's income in order to determine whether respondent proved by clear and convincing evidence that Tavern has an underpayment of tax. After examining the record, we concluded that respondent carried this burden of proof for each of the years in issue. This conclusion applies also to our consideration of the additional addition to tax under section 6653(b)(2) for Tavern's fiscal 1982 and 1983. In particular, we conclude that respondent has proven by clear and convincing evidence that (consistent with our holding supra in part I.A.(2)), Tavern omitted from income the amounts shown in table 7, and that (consistent with our holding supra (in part I.A.(2)) the underpayments of tax resulting from these omissions are attributable to fraud. Table 7 Item
FYE July 31 Deposits into Grant's
personal bank accounts
$ 39,700
$ 3,600
Designated as loans from Grant
3,000
-- Gain on sale of liquor license
-- 5,141
Cost of goods sold
17,958
Totals
42,700
26,699
Respondent has failed to carry her burden of proof as to the remaining items identified as *220 diverted deposits and shareholder loans in Tavern's fiscal 1982 and 1983. In addition, Tavern deducted $ 9,050.21 as "Travel/Promotion/Seminars" on its fiscal 1982 tax return and $ 22,538 as "Promotional" on its fiscal 1983 tax return. Respondent disallowed both of these items in full. The parties have not presented us with evidence as to these items. Respondent has failed to carry her burden of proving that any underpayments of tax resulting from these items are attributable to fraud. We hold for respondent as to the amounts of underpayments resulting from the amounts shown supra in table 7; we hold for petitioners as to any other amounts of underpayments. (2) Grant
In part I.B. of this opinion we considered the parties' disputes as to the amounts of Grant's income in order to determine whether respondent proved by clear and convincing evidence that Grant has an underpayment of tax. After examining the record, we concluded that respondent carried this burden of proof for 1981 and 1982. This conclusion applies also to our consideration of the additional addition to tax under section 6653(b)(2) for 1982. In particular, we conclude that respondent has proven by clear *221 and convincing evidence that Grant omitted from income $ 33,300 for 1982 and that the underpayment of tax resulting from this omission is attributable to fraud. We hold for respondent as to the amount of underpayment resulting from this omission; we hold for petitioners as to any other amount of underpayment for 1982. III. Amounts of Deficiencies
In part I of this opinion, respondent had the burden of proving, by clear and convincing evidence, that there were underpayments of tax, some part of which was due to fraud; respondent carried this burden except as to Grant for 1983. (Respondent also failed to carry her preponderance burden of proof under sec. 6501(e) for Grant for 1983.) In part II.B. of this opinion, respondent had the burden of proving, by clear and convincing evidence, what were the amounts of Tavern's (fiscal 1982 and fiscal 1983) and Grant's (1982) underpayments that were attributable to fraud; respondent carried this burden, but only in part. In this part of the opinion, petitioners have the burden of proving, by a preponderance of the evidence, that respondent erred in her notice of deficiency determinations as to matters of fact. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). *222 However, respondent has the burden of proof with respect to the additional income tax deficiency and additions to tax asserted in her answer, see supra note 3. Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981). Except for the adjustments which we have held respondent proved by clear and convincing evidence, the parties introduced very little evidence. One of the adjustments as to Tavern for its fiscal 1983 is described in the notice of deficiency as "5/20/83 [receipts shown as a loan] $ 14,652.73." On brief, respondent asks us to find that Grant "stopped taking corporate gross receipts after April, 1983." We treat respondent's proposed finding of fact as, in effect, a concession that this adjustment was erroneous. We conclude that each side has failed to carry its respective burden of proof. We hold for respondent as to the adjustments determined in the notices of deficiency for the open years, except as to respondent's concessions and deemed concession. We hold for petitioners as to the increase asserted in the answer. To take account of the parties' concessions and the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Thomas Edward Grant, docket No. 13766-89; and Tavern of Chester, Inc., docket No. 14882-89.↩
2. Unless indicated otherwise, all section, chapter, and subtitle references are to sections, chapters, and subtitles of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
1. Calendar years for the individual petitioners and fiscal years ending July 31 for the corporate petitioner.↩
2. The addition to tax is 50 percent of the interest on the entire deficiency.↩
3. The addition to tax is 50 percent of the interest on $ 66,387, the entire tax liability, because the tax return was filed late. See sec. 6653(c)(1)↩.
3. Among the concessions are the parties' stipulation that petitioner Beverly Grant qualifies for innocent spouse relief under sec. 6013(e) and is not liable for the deficiency and additions to tax determined for 1983. Thus, petitioner Beverly Grant no longer has an ongoing dispute with respondent in the instant case. However, she technically remains a party. See DeLucia v. Commissioner, 87 T.C. 804 (1986). Respondent also concedes that the $ 10,000 item that led to the asserted increase for Tavern of Chester, Inc.'s fiscal 1982 should be subtracted from respondent's determinations as to Tavern of Chester's, Inc.'s fiscal 1983. Petitioners concede that if any of the years involving sec. 6661 is not closed by the statute of limitations, then the appropriate petitioner is liable for a sec. 6661 addition to tax for that year, with the amount thereof depending on our determination as to the amount of the underpayment for that year. Thus, the sec. 6661 dispute is merely computational. Petitioners also concede that Tavern of Chester, Inc., did not report its $ 5,141 gain on the sale of its liquor license for Tavern of Chester, Inc.'s fiscal 1983.↩
1. Deposits marked by Grant as having been made with Tavern's receipts. Substantially all of these deposits appear to have been in the form of currency.↩
2. So stipulated. The stipulated exhibit shows the deposit as having been made on Sept. 14, 1981. The 1-day difference does not affect our analysis or our conclusions.↩
3. This is the $ 10,000 item that is described in the parties' concessions, see supra in note 3.↩
4. When Tavern bought the Valley Villa Inn, in August 1980, the purchase and sale agreement allocated $ 7,000 of the purchase price to "licenses and permits". The parties apparently agree that the entire $ 7,000 was properly allocable to the liquor license that Tavern sold in August 1982.↩
1. Amounts may not match totals, because of rounding to nearest dollar.↩
5. The record does not indicate what happened to the three other counts; we speculate that they were dismissed.↩
6. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
7. Sec. 6501 provides, in pertinent part, as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title [title 26, the Internal Revenue Code] shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. (b) Time Return Deemed Filed. -- (1) Early return. -- For purposes of this section, a return of tax imposed by this title, * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.↩
8. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. -- (1) False return. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
9. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. -- In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.↩
1. As noted, supra note 3, respondent asserts that one $ 10,000 deposit into one of Grant's accounts should be taken into account for Tavern's fiscal 1982 instead of fiscal 1983. Also, in arriving at the $ 104,546.99 adjustment, respondent subtracted from the $ 96,109.67 total deposits the $ 12,141.37 proceeds from the sale of the liquor license. This table sets forth the net amounts as determined in the notice of deficiency. ↩
10. As table 2 shows, Tavern's reported fiscal 1983 taxable income ($ 49,024) was $ 56,636.38 less than the amount Weiskind had calculated ($ 105,660.38). The parties have focussed only on the closing inventory question and have not dealt with or explained the remaining $ 38,678.34 of differences between the tax return that was filed and the tax return that Weiskind had prepared.↩
11. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;↩
12. Respondent appears to have treated these amounts in the notices of deficiency as income to Grant (and also to Tavern) at the times of the deposits. Compare Kahrahb Restaurant, Inc. v. Commissioner, T.C. Memo. 1992-263, in which it appears that the shareholders were taxed when their corporation paid their personal expenses, even though the corporation was taxed in that case at the time of the deposits. In the instant cases, petitioners dispute the taxability of these amounts, but do not dispute whether, if anything is taxable, then the taxable events and amounts should be the times and amounts of Tavern's expenditures on Grant's behalf. In the circumstances of the instant cases, we will limit ourselves to what is disputed by the parties. Estate of Fusz v. Commissioner, 46 T.C. 214, 215↩ n.2 (1966).
13. Sec. 301 provides, in pertinent part, as follows: SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General. -- Except as otherwise provided in this chapter [chapter 1, relating to normal taxes and surtaxes] a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection(c). * * * (c) Amount Taxable. -- In the case of a distribution to which subsection (a) applies -- (1) Amount constituting dividend. -- That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. (2) Amount applied against basis. -- That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock. (3) Amount in excess of basis. -- (A) In general. -- Except as otherwise provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as a gain from the sale or exchange of property.↩
14. Sec 316 provides, in pertinent part, as follows: SEC. 316. DIVIDEND DEFINED. (a) General Rule. -- For purposes of this subtitle [subtitle A, relating to income taxes], the term "dividend" means any distribution of property made by a corporation to its shareholders -- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.
Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. * * *↩
15. The parties have not told us whether Tavern was an accrual basis taxpayer, as to matters other than inventory. If Tavern was a cash basis taxpayer, then it would not be allowed to reduce its earnings and profits on account of the resulting tax deficiency and appropriate additions to tax. Webb v. Commissioner, 67 T.C. 1008, 1018-1022↩ (1977).
16. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (e) Substantial Omission of Items. -- Except as otherwise provided in subsection (c) -- (1) Income taxes. -- In the case of any tax imposed by subtitle A -- (A) General rule. -- If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph -- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.↩
17. Sec. 6653(b) provides, in pertinent part, as follows: SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. (2) Additional amount for portion attributable to fraud. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).
For 1981, the fraud addition to tax is section 6653(b), the first sentence of which is the same as the above-quoted section 6653(b)(1). Par. (2) was added by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616, and was effective for taxes the payment of which (determined without regard to any extension) is after Sept. 3, 1982. In the instant case, par. (2) is applicable to the additions to tax determined against Grant for 1982 and against Tavern for fiscal 1982 and fiscal 1983. The subsequent amendments of this provision by sec. 1503 of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2742), by sec. 1015(b)(2)(A) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647; 102 Stat. 3342, 3569), and by sec. 7721(a) of the Omnibus Budget Reconciliation Act of 1989 (Pub. L. 101-239, 103 Stat. 2106, 2395) do not affect the instant case. As a result of the 1989 Act, the revised fraud addition to tax now appears in secs. 6663 and 6651(f).↩
18. Sec 1503(a) of the Tax-Reform Act of 1986, Pub. L. 99-514, 100 Stat: 2085, 2742, amended sec. 6653(b)(2) to provide as follows: SEC. 6653. ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD. * * * (b) Fraud. -- * * * (2) Determination of portion attributable to fraud. -- If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes is not attributable to fraud.
This amendment placed the burden of proof on the taxpayer to establish that a portion of the deficiency was not↩ attributable to fraud. The amendment applies to returns the due date of which is after Dec. 31, 1986, and so does not apply to the instant cases.